IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Michael Dewayne Samuels, Jr., | ) | C/A No.: 1:15-3086-PMD-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

    A.    Procedural History

On March 7, 2012, Plaintiff's mother Tarsha McAllister ("Ms. McAllister"), filed an application for SSI child's benefits in which she alleged his disability began on March 1, 2012. Tr. at 142–47. Plaintiff's application was denied initially and upon reconsideration. Tr. at 75–78, 86–87. On November 6, 2013, Plaintiff had a hearing

before Administrative Law Judge ("ALJ") Peggy McFadden-Elmore. Tr. at 22–53 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 17, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–21. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 6, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 17 years old at the time of the hearing. Tr. at 29. He was enrolled in the tenth grade. Tr. at 30. He has no past relevant work ("PRW"). Tr. at 148. He alleges his disability began on March 1, 2012. Tr. at 142.

2.    Medical and Educational History

Records from Clarkson Optometric Clinic for the period from January 3, 2003, to May 14, 2010, indicate diagnoses of myopia and astigmatism in Plaintiff's bilateral eyes. Tr. at 243–48.

On September 14, 2010, Luther C. Williams, M.D. ("Dr. Williams"), wrote a letter to Plaintiff's primary care physician Carol Heebner, M.D. ("Dr. Heebner"), regarding Plaintiff's cardiac examination. Tr. at 249. Dr. Williams noted that Plaintiff was doing well clinically following his history of surgical repair of a transitional atrioventricular septal defect. *Id.* He indicated Plaintiff did not require medication or restrictions on his activity. *Id.*

A March 23, 2011 individualized education program ("IEP") plan indicates Plaintiff was in seventh grade and met state standards for English/language arts, math, and social studies on the 2010 Palmetto Assessment of State Standards ("PASS") test. Tr. at 310. It indicated Plaintiff's Measures of Academic Progress ("MAP") test scores showed him to be in the sixteenth percentile for reading, slightly below the twentieth percentile for reading comprehension, and below the tenth percentile for verbal fluency. *Id.* On written expression testing, Plaintiff did not use punctuation or verb tenses correctly and failed to develop the plot or to use adequate detail in his writing. *Id.* He neglected to use transitions and his word choice was predictable. *Id.* The plan administrator noted that Plaintiff's academic performance and behavior had declined and that he had neglected to do homework or to study for tests. *Id.*

An audiological assessment summary report for the 2011–2012 school year indicated that September 8, 2009 testing showed Plaintiff to have mild conductive hearing loss in his right ear with borderline normal hearing in his left ear. Tr. at 297. Earlier testing on March 19, 2009, showed Plaintiff to have moderate conductive hearing loss bilaterally that resulted in him missing fragments of speech and led to misunderstandings. *Id.* The report indicated Plaintiff's hearing fluctuated and was better when he was "free of the middle ear component."[1] *Id.*

Plaintiff presented to the emergency room at Palmetto Health Richland on January 1, 2012, after injuring his right eye. Tr. at 253. Plaintiff reported that a firework exploded

---

[1] The phrase "free of the middle ear component" likely pertains to a reference in the March 19, 2009 evaluation to Plaintiff having a history of ear infections. Tr. at 299.

approximately two feet away from his face and struck and shattered his eyeglasses. *Id.* A computed tomography ("CT") scan revealed Plaintiff to have a ruptured right globe with a foreign body within the globe. Tr. at 267. Plaintiff underwent examination under anesthesia and repair of the ruptured globe in his right eye. Tr. at 263. He was discharged with prescriptions for eye drops and instructions to follow up with an ophthalmologist in Greenville, who would attempt to remove the foreign body from his eye. Tr. at 253.

On January 4, 2012, William Lloyd Clark, M.D. ("Dr. Clark"), performed multiple surgical procedures on Plaintiff's right eye that included pars planar vitrectomy, membrane peel, pars planar lensectomy, removal of an intraocular foreign body, and revision of repair of a corneal scleral laceration. Tr. at 277. Dr. Clark subsequently performed several surgical procedures on February 18, 2012, that included placement of a temporary keratoprosthesis, repair of a retinal detachment using scleral buckle/vitrectomy, and penetrating keratoplasty. Tr. at 284.

On April 12, 2012, Plaintiff's resource teacher Debora Webster ("Ms. Webster"), completed a teacher questionnaire. Tr. at 186–93. Ms. Webster indicated she had taught Plaintiff from October 19, 2011, until he went on homebound services on January 30, 2012. Tr. at 186. She stated Plaintiff was enrolled in regular classes with the support of one resource period per day. *Id.* Ms. Webster indicated Plaintiff had slight problems in the domain of acquiring and using information. Tr. at 187. She assessed Plaintiff to have no problems attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself. Tr. at 188–91. She indicated she

could understand one-half to two-thirds of Plaintiff's speech on the first attempt. Tr. at 190.

On April 20, 2012, Plaintiff reported to Dr. Clark that he continued to experience floaters. Tr. at 357. Dr. Clark assessed Plaintiff's vision as 20/200 in the right eye and 20/40 in the left eye. *Id.*

On April 30, 2012, a pediatric echocardiogram indicated Plaintiff was status-post surgical repair of a transitional atrioventricular septal defect. Tr. at 394. It revealed no residual shunts, but indicated mild-to-moderate mitral regurgitation and mild tricuspid regurgitation. *Id.*

State agency medical consultant Charles McKenzie, M.D. ("Dr. McKenzie"), reviewed the evidence and assessed Plaintiff's limitations in each of the six domains on May 19, 2012. Tr. at 58–59. He determined Plaintiff had no limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for himself, or health and physical well-being. *Id.* Dr. McKenzie found that Plaintiff's loss of visual efficiency was a nonsevere impairment. Tr. at 58. He indicated Plaintiff had undergone corneal transplant in his right eye, but noted that his left eye vision was normal. Tr. at 59. He stated Plaintiff had normal hearing on the left and only mild conductive hearing loss on the right. *Id.* He found that the record did not support a diagnosis of attention deficit hyperactivity disorder ("ADHD") based on a lack of diagnosis and the absence of prescribed medication. *Id.* He observed that the school records indicated Plaintiff had a speech and

language impairment, but noted that Plaintiff was not in speech therapy and that his teacher indicated no problems with his speech in the questionnaire. *Id.*

On June 5, 2012, Plaintiff indicated he was doing well and had improved visual acuity. Tr. at 380. He denied pain, itching, watering, and burning in his eye. *Id.* His visual acuity was 20/100 in his right eye and 20/60 in his left eye without correction and 20/100 in his right eye and 20/30 in his left eye with correction. *Id.*

On August 2, 2012, Plaintiff denied eye pain, flashes, and floaters, but complained that his right eye vision continued to be blurred. Tr. at 384.

In August 2012, state agency consultants Katrina B. Doig, M.D. ("Dr. Doig"), and Kevin King, Ph. D. ("Dr. King"), reviewed the evidence of record and assessed Plaintiff's functioning in each of the six domains. Tr. at 69–70. They determined Plaintiff had no limitation in acquiring and using information; no limitation in attending and completing tasks; less than marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; no limitation in caring for himself; and less than marked limitation in health and physical well-being. *Id.* Dr. King noted that there was an allegation of ADHD in the application, but that the record did not support a diagnosis of ADHD. Tr. at 69. He observed that Plaintiff's school notes indicated he had a speech and language impairment, but determined the record suggested he had no medically-determinable speech and language impairment. *Id.* Dr. Doig explained that she assessed Plaintiff to have less than marked limitations in interacting and relating with others because he had a history of articulation deficits, but no longer received speech therapy. *Id.* She observed that Plaintiff's teacher noted some difficulty understanding his speech,

but that his caretaker stated his speech could be understood most of the time by those who knew him well. *Id.* Dr. Doig explained that she assessed less than marked limitations in health and physical well-being because Plaintiff had normal left eye vision and denied right eye pain, but endorsed blurred vision in the right eye. Tr. at 70. She stated Plaintiff had a history of mild conductive hearing loss on the right with borderline normal hearing on the left, but had 100% word discrimination scores bilaterally. *Id.* She noted Plaintiff had a remote history of surgical repair of a transitional atrioventricular septal defect, but had no ongoing cardiovascular symptoms. *Id.* She observed that Plaintiff had a diagnosis of obesity with a body mass index of 36.3, but had no evidence of obesity-related complications. *Id.*

On December 17, 2012, Plaintiff presented to Greenwood Genetic Center for an endocrinology consultation regarding obesity and congenital heart disease. Tr. at 391. He reported some struggles in math and reading and some speech and behavioral issues. *Id.* Yuri Zarate, M.D. ("Dr. Zarate"), indicated Plaintiff's obesity was most likely the result of external causes. Tr. at 392. He stated Plaintiff's learning difficulties appeared to be mild and "not in the intellectual disability range." *Id.*

A functional behavioral assessment dated April 23, 2013, indicated Plaintiff's problem behaviors included being tardy and skipping classes; disrespecting adults by refusing to follow directions; and getting into trouble by hanging around peers who were bad influences. Tr. at 239. Plaintiff stated he had been bullied and teased over the past few years and had selected a group of friends "for protection." *Id.* The assessment noted that most of Plaintiff's troubles had occurred outside the classroom setting. *Id.* Plaintiff

7

agreed to attend class and be on time; to follow directions and be more respectful to authority figures; and to spend more time with appropriate peers. *Id.* Plaintiff's behavioral intervention plan advised him to handle future incidents of bullying and teasing by immediately reporting them to school staff. Tr. at 242. The plan also provided for Plaintiff's inclusion in lunch time discussion groups and the assignment of a mentor to assist him. *Id.*

An IEP plan dated May 28, 2013, indicates Plaintiff's primary disability as "Deaf and Hard of Hearing" and his other disabling condition as "Speech or Language Impairment." Tr. at 220. The plan reflected that Plaintiff spent 40–79% of the school day in a regular education environment. *Id.* It showed that Plaintiff was enrolled in a "standard course of study leading to a high school diploma." *Id.* Plaintiff reported that he enjoyed playing football and video games in his free time and that he planned to enroll in either a community or four-year college after graduating from high school. *Id.* The plan indicated Plaintiff received one period of resource support services daily to assist him with his general education classes and one weekly 30-minute session of speech therapy. Tr. at 222. It noted that Plaintiff had some behavioral issues that required he attend school on an abridged schedule from March 13 to April 23, 2013, and be placed on homebound status for the remainder of the school year. *Id.* It reported that Plaintiff worked diligently to turn in his assignments on time, had great attendance, and demonstrated no behavioral problems on the abridged schedule. *Id.* Plaintiff's homebound teacher reported that he had received and turned in assignments on time; was punctual; attended sessions regularly; and was eager, well behaved, and respectful. *Id.* On

an oral reading fluency test, Plaintiff read 105 words correctly per minute, which placed him below the tenth percentile nationally when compared to other students his age. *Id.* Plaintiff's reading comprehension score was also below the tenth percentile when compared to his same-aged peers. *Id.* He scored below the tenth percentile when given open-ended writing prompts. *Id.* He scored in the fiftieth percentile on a math concepts and applications probe. *Id.* The plan noted that Plaintiff had mild conductive bilateral hearing loss that caused him to miss fragments of speech and led to misunderstandings. *Id.* It indicated Plaintiff did not use sound field amplification in the classroom and that his level of difficulty in understanding speech was dependent on the noise level in the setting and his distance from the teacher. *Id.* To accommodate Plaintiff's hearing loss, the plan recommended that he be given preferential seating away from noise sources and be allowed to see his instructor's face. *Id.* Plaintiff reported that his hearing loss did not "significantly negatively impact his behavior" and stated that "he made choices" that resulted in multiple discipline referrals. Tr. at 223.

      C.      The Administrative Proceedings

            1.      The Administrative Hearing

                  a.      Plaintiff's Testimony

At the hearing on November 6, 2013, Plaintiff testified he was 17 years old. Tr. at 29. He stated he lived in a house with his mother, two sisters, and a nephew. Tr. at 30. He indicated he was 6' tall and weighed approximately 250 pounds. *Id.* He denied having a driver's license. *Id.*

Plaintiff testified he was in the tenth grade and had repeated the third grade. Tr. at 30–31. He indicated his current classes included geometry, algebra I, English II, gym III, personal health, and support lab. Tr. at 31. He explained that support lab was a resource class. *Id.* He stated he rotated from class to class and attended classes with eight different teachers each day. Tr. at 32.

Plaintiff testified that he had previously been suspended from school. *Id.* He indicated his last suspension occurred during his ninth grade year and that he was suspended for one or two days for being tardy. *Id.* He stated he was also suspended for three days during his ninth grade year for fighting. Tr. at 32–33. He estimated that he had been suspended for fighting for fewer than 15 days during the entire period he had attended school. Tr. at 33. He indicated he had engaged in fights because he was teased, bullied, and picked on. *Id.* He stated he did not really have friends at school or outside of school. Tr. at 34–35.

Plaintiff testified he rode a bus to school. Tr. at 35. He indicated he used a computer to complete school work and to play games. *Id.* He stated he sometimes read books for class. Tr. at 36. He indicated his household chores included mowing the grass, maintaining the yard, taking out the trash, walking his dog, and occasionally washing dishes. Tr. at 37. He testified he got along "okay" with his sisters and sometimes helped to babysit his two-year-old nephew. *Id.*

Plaintiff testified that he had experienced cardiac symptoms during football tryouts in 2012. Tr. at 50. He stated he felt like his heart was racing and that he was going to faint while running up a hill and had experienced chest pain while running in the heat

several days earlier. *Id.* He indicated the football practices were held outside and lasted four hours. Tr. at 51.

a.     Witness's Testimony

Ms. McAllister confirmed that Plaintiff's IEP plan addressed his hearing, speech, and language problems. Tr. at 26. She indicated that Plaintiff did not use his sound field amplifier in the classroom because other kids teased him about it. *Id.* She stated Plaintiff sat in the front of his classes because of his hearing impairment. *Id.*

Ms. McAllister testified that Plaintiff underwent a cornea transplant during his eighth grade year and was on homebound services from January through May. Tr. at 27–28, 38. She indicated Plaintiff was injured when a firework hit him in his right eye, broke his glasses, and caused a piece of glass to damage his cornea and retina. Tr. at 48. She stated that during the period of homebound instruction, the instructor would read the assignments to Plaintiff because he was unable to read or write. Tr. at 28.

Ms. McAllister testified Plaintiff was not taking cardiac medications. Tr. at 29. She stated he continued to have a valve leakage in his heart that affected the blood flow to his lungs and caused him to sweat. Tr. at 48. She indicated Plaintiff visited Dr. Williams annually and needed to follow up with him. *Id.* She stated Plaintiff attempted to try out for football in the eighth grade, but was unable to play because his heart was racing and he felt like he was going to collapse. Tr. at 49.

Ms. McAllister testified that Plaintiff had previously attended school at Crayton Middle and that he did well before he was placed on homebound instruction. Tr. at 39.

She stated Plaintiff attended AC Flora High School for ninth grade, but ended up being placed on a behavioral plan after he threatened another student. Tr. at 41–42.

Ms. McAllister testified that Plaintiff sometimes demonstrated a bad attitude and directed outbursts at family members. Tr. at 44–45. She indicated Plaintiff recently left the house for two to three hours after an argument with his grandmother. Tr. at 45. She stated she had to remind Plaintiff to engaging in grooming activities like trimming his nails. Tr. at 46. She indicated she assisted Plaintiff with his homework because he was not a good reader and needed encouragement. Tr. at 46–47.

Ms. McAllister stated she had some difficulty affording medical treatment for Plaintiff because she was unemployed and had been without health insurance at times. Tr. at 51.

2.    The ALJ's Findings

In her decision dated January 17, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant was born on August 16, 1996. Therefore, he was an adolescent on March 7, 2012, the date the application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).
2.    The claimant has not engaged in substantial gainful activity since March 7, 2012, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: bilateral conductive hearing loss and loss of visual efficiency (20 CFR 416.924(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).
5.    The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

12

6. The claimant has not been disabled, as defined in the Social Security Act, since March 7, 2012, the date the application was filed (20 CFR 416.924(a)).

Tr. at 13–21.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not properly consider whether Plaintiff's combination of impairments resulted in marked limitations in two domains of functioning or extreme limitation in one domain of functioning; and

2) the ALJ did not find that Plaintiff's impairments met Listing 112.05(d).

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A. Legal Framework

1. The Commissioner's Determination-of-Disability Process

For purposes of eligibility for children's disability benefits under the Act, an individual under age 18 will be considered disabled if he has a "medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for not less than 12 months." 20 C.F.R. § 416.906; *see also* 42 U.S.C. § 1382c(a)(3)(C)(i).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations in adult disability matter and noting "need for efficiency" in

considering disability claims). The Commissioner's regulations establish a three-part evaluation process: (1) determine whether the child is currently engaged in substantial gainful activity ("SGA"); (2) determine whether the child has a severe impairment or impairments; (3) determine whether the child's impairments meet, medically equal, or functionally equal any impairment found in the Listings. *See* 20 C.F.R. § 416.924; 20 C.F.R. Pt. 404, Subpt. P, App'x 1.

In determining whether a claimant has engaged in SGA, the Commissioner applies the same rules for children as for adults. 20 C.F.R. § 416.924(b). SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. § 416.972(b). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA. 20 C.F.R. §§ 416.974, 416.975. If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the ALJ must determine whether the claimant has a medically-determinable "severe" impairment or a combination of impairments that is "severe." For an individual who has not attained age 18, a medically-determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of

14

slight abnormalities that causes no more than minimal functional limitations. If the claimant does not have a medically-determinable severe impairment(s), he is not disabled. 20 C.F.R. § 416.924(c). If the claimant has a severe impairment, the analysis proceeds to the third step.

At step three, the Commissioner must determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a Listed impairment, or that functionally equals one of the impairments found in the Listings. In making that determination, the Commissioner must consider the combined effect of all medically-determinable impairments, even those that are not severe. 20 C.F.R. §§ 416.923, 416.924a(b)(4), 416.926a(a), (c). If the claimant has an impairment or combination of impairments that has lasted or is expected to last for a period of 12 months or more and that meets, medically equals or functionally equals the Listings, he is presumed to be disabled. 20 C.F.R. § 416.924(d). If the claimant's impairment has not lasted for the specified duration, is not expected to last for the specified duration, or does not meet, medically equal, or functionally equal the Listings, the claimant is not disabled. *Id.*

In determining whether a claimant meets one of the impairments in the Listings, the Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the Listed impairment. "If a severe impairment is of the degree set forth in a Listing, and such impairment meets the twelve-month durational requirement . . . then [the claimant] 'is conclusively presumed to be disabled and entitled to benefits.'" *Warren v. Shalala*, 29

15

F.3d 1287, 1290 (8th Cir. 1994) (quoting *Bowen v. City of New York*, 476 U.S. 467, 470–71 (1986)). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). It is not enough that the impairment have the diagnosis of a Listed impairment, the claimant must also have the findings shown in the Listing of that impairment. 20 C.F.R. § 416.925(d); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the claimant's burden to show that his impairment is presumptively disabling and to furnish medical evidence regarding his condition).

For a claimant to prove that his impairment medically equals a Listing, he must show one of the following: (1) that he has an impairment described in the Listings and has other findings related to his impairment that are at least of equal medical significance to the criteria specified in the Listing; (2) that he has an impairment that is not described in the Listings, but has findings related to his impairment at are at least of equal medical significance to those of a closely analogous Listed impairment; or (3) that he has a combination of impairments that do not meet any particular Listings, but are at least of equal medical significance to those of closely analogous Listed impairments. 20 C.F.R. § 416.926(b)

If the claimant's impairment or combination of impairments does not meet or medically equal the requirements of a Listing, the Commissioner will decide whether it results in limitations that functionally equal the Listings. *See* 20 C.F.R. § 416.926a(a). To assess functional equivalence, the Commissioner considers how the claimant functions in activities within six broad areas known as "domains" that are intended to capture what a

child can or cannot do. 20 C.F.R. § 416.926a(b)(1). These domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)–(vi). To establish functional equivalence, the claimant must have a medically-determinable impairment or combination of impairments that results either in "marked" limitations in two domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(b)(1).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *see also Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002), citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court

must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

1.      Functional Equivalence to a Listing

Plaintiff argues the ALJ did not adequately assess the effects of his impairments in concluding that he lacked marked limitations in two domains of functioning or extreme limitation in one domain of functioning. [ECF No. 13 at 5]. He maintains the ALJ cited only the evidence from the record that supported her conclusion and ignored evidence to the contrary. *Id.* at 5–6. He contends the ALJ did not consider the "whole child" approach in her analysis. *Id.* at 6. He argues his hearing difficulty, visual disturbance, and obesity were consistent with marked limitations in the domain of health and physical well-being and that his pervasive behavioral issues, developmental difficulties, and delayed academic progress supported a finding that he had marked limitations in the domains of interacting and relating with others; attending and completing tasks; and acquiring and using information.[2] [ECF No. 16 at 1–2].

---

[2] Although Plaintiff argues the ALJ did not properly consider these domains and cherry-picked evidence, he neglects to cite specific evidence that the ALJ ignored that would support a finding of marked or extreme limitation in any domain. *See generally* ECF Nos. 13, 16.

The Commissioner argues that the ALJ's determination that Plaintiff's impairments did not functionally equal a Listing is supported by substantial evidence that includes medical treatment notes, education records, teacher questionnaires, and Plaintiff's own statements about his activities of daily living. [ECF No. 14 at 1]. She contends the ALJ cited sufficient evidence to support her conclusions that Plaintiff had no marked or extreme limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for himself, and health and physical well-being. *Id.* at 11–17.

In evaluating whether a child's impairments are functionally equivalent to the Listings, the ALJ must consider the "whole child" and determine what he cannot do, has difficulty doing, or is restricted from doing because of his impairments. 20 C.F.R. § 416.926a(a); SSR 09-1p. She must consider all relevant information in the case record, which includes medical evidence, test scores, and information from parents, caregivers, teachers, and school personnel. 20 C.F.R. § 416.924a(a). She should then compare the child's functioning to that of other children his age who do not have impairments. 20 C.F.R. § 414.924a(b)(3); SSR 09-1p. The ALJ must assess the interactive and cumulative effects of the child's severe and nonsevere impairments. 20 C.F.R. §§ 416.924a(b)(4), 416.926a(a). She must also consider the child's abilities to "initiate, sustain, and complete" activities, "the amount of help or adaptations" the child needs, and "the effects of structured or supportive settings." 20 C.F.R. § 416.924a(b)(5); SSR 09-1p.

The regulations require an ALJ to find that a child has "marked" limitation in a domain when his impairment or combination of impairments interferes seriously with his

ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation also means a limitation is "more than moderate" but "less than extreme," and may arise when several activities or functions are limited, or when only one is limited. *Id.*

An ALJ should find that a child has an "extreme" limitation in a domain when his impairment or combination of impairments interferes very seriously with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation also means a limitation is "more than marked," and may arise when one or more activities or functions are limited. *See id.*

Because Plaintiff limits discussion of the domains to "health and physical well-being," "interacting with and relating to others," "acquiring and using information," and "attending and completing tasks," the undersigned limits analysis to these domains.

a.    Health and Physical Well-Being

An ALJ should consider a child to have a "marked" limitation in the domain of "health and physical well-being" if he is frequently ill because of his impairments or has frequent exacerbations of his impairments that result in significant documented symptoms or signs. 20 C.F.R. § 416.926a(e)(2)(iv). She should consider the child to have "extreme" limitation in the domain if he is frequently ill because of his impairment or has frequent exacerbations of his impairment "that result in significant documented symptoms or signs substantially in excess of the requirements for showing a 'marked' limitation." 20 C.F.R. § 416.926a(e)(3)(iv). However, this generally requires that the impairments meet or medically equal the requirements of a Listing. *Id.*

The ALJ discussed Plaintiff's medical records and his history of rupture to his right eye and corneal transplant, but noted that Plaintiff's eye condition had stabilized from February to August 2012. Tr. at 15. She noted that Plaintiff had reported some blurriness, but that his right eye vision was at least 20/200 and that he wore corrective lenses. *Id.* She stated that records from Dr. Williams indicated Plaintiff was doing well following the repair of his septal defect, did not require cardiac medications, and had not pursued any significant follow up. *Id.* She indicated Dr. Zarate had concluded Plaintiff's obesity was the result of external factors and was not associated with any identifiable syndrome. *Id.* She determined Plaintiff had "less than marked limitation in health and physical well-being" based on the state agency consultants' evaluations; Plaintiff's assessed vision; and the fact that Plaintiff was prescribed medication only for his eyes. Tr. at 21.

The ALJ considered all the relevant evidence in the case record in determining that Plaintiff had less than marked limitation in health and physical well-being. *See* 20 C.F.R. § 416.924a(a). The record does not suggest that Plaintiff was frequently ill; had frequent exacerbations of impairments; or demonstrated significant symptoms or signs of impairments. *See* 20 C.F.R. § 416.926a(e)(2)(iv). Although Plaintiff's eye injury resulted in several surgeries and multiple follow up visits, the record supports the ALJ's finding that Plaintiff had significantly recovered from his injury by August 2012 and that the visual loss in his right eye resulted in less than marked restriction. *See* Tr. at 15; *see also* Tr. at 380, 384. The record also supports the ALJ's finding that Plaintiff's septal defect repair resulted in less than marked limitations based on his lack of follow up treatment

and his cardiologist's indication that he was doing well and did not require medications. *See* Tr. at 15; *see also* Tr. at 249. The ALJ also reasonably relied on Dr. Zarate's conclusion that Plaintiff's obesity was caused by external factors and was not associated with any syndrome in determining that his obesity caused less than marked restrictions. *See* Tr. at 15; *see also* Tr. at 391 ("Mike has struggled with excessive weight gain over the last few years. It is believed that a lot of it had to do with his lack of exercise and poor diet."), 392 ("From the history and looking at endocrinology's assessment, it appears that Mike's obesity has been mostly attributed to external causes."). The ALJ rationally relied on the opinions of the state agency consultants, who reviewed the evidence and found Plaintiff to have less than marked limitations in this domain. *See* Tr. at 21, *see also* Tr. at 59, 70. The ALJ indicated that she considered the "whole child" in reaching her conclusion [Tr. at 14], and her specific consideration of Plaintiff's vision problems, heart defect, and obesity demonstrated that she considered the interactive and cumulative effects of his severe and nonsevere impairments. *See* 20 C.F.R. §§ 416.924a(b)(4), 416.926a(a). In light of the evidence of record that fails to demonstrate significant limitations related to Plaintiff's health and physical well-being, frequent illnesses, or severe exacerbation of symptoms, the undersigned recommends the court find that substantial evidence supported the ALJ's conclusion that Plaintiff had less than marked limitation in the domain of health and physical well-being.

b.    Attending and Completing Tasks

"Attending and completing tasks" considers the claimant's ability to focus and maintain attention. 20 C.F.R. §416.926a(h). This domain examines the child's ability to

initiate, carry through, and finish activities and considers his pace in performing activities and his ability to transition from one activity to another. *Id.* Adolescents are expected to "be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects." 20 C.F.R. § 416.926a(h)(2)(v). They should also be able to organize materials and plan time to complete school tasks and assignments; maintain attention on tasks for extended periods of time; and not be unduly distracted by or distracting to peers in a school or work setting. *Id.*

The ALJ found Plaintiff had "no limitation in attending and completing tasks." Tr. at 18. She cited the state agency consultants' evaluations. *Id.* She acknowledged that Plaintiff alleged a diagnosis of ADHD, but stated the record contained no medical evidence to support such a diagnosis. *Id.* She indicated the questionnaire completed by Plaintiff's teacher recognized no difficulty in this domain. *Id.* Finally, she noted that Plaintiff's IEP was related to his hearing and did not contain any provisions that pertained to his abilities to attend and complete tasks. *Id.*

Plaintiff argues that he has a diagnosis of ADHD [ECF No. 13 at 3] that resulted in "pervasive behavioral issues and retarded academic progress" and supported a finding of marked limitations in the domains of interacting and relating with others, attending and completing tasks, and acquiring and using information. [ECF No. 16 at 2]. Pursuant to 20 C.F.R. § 416.924a(b)(2), the child's limitations in functioning must result from his medically-determinable impairments. Therefore, it is improper for the ALJ to consider any alleged limitation in functioning that does not result from a medically-determinable

impairment. *See id.* The ALJ stated that Plaintiff's IEP plans did not pertain to ADHD or any diagnosed learning or behavioral problems. *See* Tr. at 18. Although Plaintiff's IEP plans noted standardized test scores below the twentieth percentile in most areas and some behavioral problems and disciplinary actions, they did not suggest Plaintiff had ADHD or any learning disability or that his behavioral problems were related to a diagnosed impairment. *See generally* Tr. at 220–236, 302–322.  The ALJ also relied on the state agency consultants' opinions that Plaintiff did not have ADHD or a learning disability. *See* Tr. at 16, 18; *see also* Tr. at 59, 70 ("There is an allegation of ADHD on the application. However, there are no medical records regarding this condition in the file. . . ."). The undersigned also notes that Plaintiff's mother denied that he had ADHD[3] and that Dr. Zarate specifically concluded that Plaintiff's mild academic deficits were not consistent with intellectual disability. *See* Tr. at 392. In light of the evidence of record, the undersigned recommends the court find that the ALJ appropriately relied on the record to conclude that Plaintiff did not have ADHD or any other learning or behavioral problem that resulted in functional impairments.

Having determined that Plaintiff did not have deficits in attending and completing tasks that were attributable to ADHD or other behavioral or learning impairments, the ALJ properly concluded that Plaintiff had no limitation in attending and completing tasks. She appropriately relied upon the opinions of Drs. McKenzie and King, who

---

[3] A claim communications note from Kimberly Talbert ("Ms. Talbert"), dated April 24, 2012, indicated she spoke with Ms. McAllister regarding the allegation that Plaintiff had ADHD. Tr. at 57. Ms. Talbert wrote "Ms. McAllister said that the claimant does not have this condition. She said that no one has ever mentioned this condition to her, and he has not seen a doctor for it, and is not on medication for it." *Id.*

referred to the medical records, the school reports, and the teacher questionnaire to support their determinations that Plaintiff had no limitation in this domain. *See* Tr. at 16; *see also* Tr. at 59, 69 (finding "no limitation" in attending and completing tasks). Her analysis reflects consideration of all relevant evidence in the record. *See* 20 C.F.R. § 416.924a(a). The ALJ cited the teacher questionnaire and noted that Plaintiff's teacher indicated "no limitation" in this domain. *See* Tr. at 18, citing Tr. at 188 (noting for the domain of "attending and completing tasks," Ms. Webster selected "No problems observed in this domain; functioning appears age-appropriate."). Finally, the ALJ referenced Plaintiff's IEP plans and noted that they were related to his hearing problems and did not contain any provisions that pertained to his abilities to attend and complete tasks. *See* Tr. at 18; *see generally* Tr. at 220–236, 302–322. In light of the foregoing, the undersigned recommends the court find the ALJ relied upon substantial evidence to support her conclusion that Plaintiff had no limitation in attending and completing tasks.

c.    Interacting and Relating with Others

The domain of "interacting and relating with others" considers how well the child initiates and sustains emotional connections with others, develops and uses language of the community, cooperates with others, complies with rules, responds to criticism, and respects and cares for others' possessions. 20 C.F.R. § 416.926a(i). Adolescents are expected to be able to initiate and develop relationships with same-age peers; to relate appropriately to other children and adults, both individually and in groups; to solve conflicts with peers, family members, and adults outside the family; to recognize differences in social rules; to intelligibly express feelings; to ask for assistance in meeting

25

their needs; to seek information; to describe events; and to tell stories in different environments and with all types of people. 20 C.F.R. § 416.926a(i)(2)(v).

The ALJ assessed Plaintiff to have "less than marked limitation in interacting and relating with others." Tr. at 18. To support her conclusion, she cited the state agency consultants' evaluations and the teacher questionnaire. Tr. at 18–19. She acknowledged Ms. McAllister's testimony that Plaintiff had been suspended a couple of times since the ninth grade and the inclusion in the record of a behavior intervention plan, but concluded there was "little evidence of any significant behavioral problem on the part of the claimant." *Id.*

The undersigned recommends the court find that substantial evidence supported the ALJ's conclusion that Plaintiff had less than marked limitations in interacting and relating with others. The ALJ acknowledged that the state agency consultants' opinions, Ms. McAllister's testimony, and Plaintiff's school records showed some limitations in this domain. *See* 39–42 (Ms. McAllister testified that Plaintiff had engaged in some bad behavior at school that resulted in the implementation of a behavioral plan), 69 (Dr. Doig indicated Plaintiff had a history of articulation deficits that consisted of omissions and that those unfamiliar with his speech may have some difficulty understanding it), 239–42 (a behavioral assessment and plan indicated Plaintiff was coming to classes late, skipping classes, failing to follow directions, disrespecting authority figures, and hanging around peers who were not good influences to protect himself from being bullied). The ALJ used the "whole child" approach in that she considered Plaintiff's behavior as it related to his medically-determinable impairments. *See* Tr. at 18–19; *see also* 20 C.F.R. §§

416.924a(b)(4), 416.926a(a). However, the ALJ concluded that the opinions of the state agency consultants and Plaintiff's teacher did not support a finding of marked deficits in interacting and relating with others. *See* Tr. at 69 (Dr. Doig assessed less than marked limitation in interacting and relating with others and noted that Plaintiff no longer received speech therapy and that his caretaker had indicated his speech could be understood most of the time by those who knew him well), 189 (Ms. Webster indicated Plaintiff functioned in an age-appropriate manner in this domain). Although the record indicates Plaintiff had a history of speech and language deficits and that he engaged in some negative behavior, the totality of the evidence supports the ALJ's finding that he did not have a significant, ongoing behavioral problem that resulted in marked or extreme limitation. *See* Tr. at 32–33 (Plaintiff testified that he was last suspended during his ninth grade year and had been suspended for a total of about 15 days during his entire period of schooling; he stated he was suspended for being tardy and for fighting with individuals who teased and bullied him), 34 (Plaintiff indicated he was supposed to go to his guidance counselor to report being bullied, but that he had not had to visit her to report bullying during the current academic year), 223 (Plaintiff reported that his hearing loss did not "significantly negatively impact his behavior" and stated that "he made choices" that resulted in multiple discipline referrals). In sum, the ALJ's evaluation reflects her consideration of Plaintiff's abilities, deficiencies, and accommodations, as reflected in the record as a whole. *See* 20 C.F.R. §§ 416.924a(a), (b), 416.926a(a).

d.    Acquiring and Using Information

"Acquiring and using information" considers that an adolescent should continue to demonstrate learning from past academic assignments and use that learning in daily living situations without assistance. 20 C.F.R. §416.926a(g)(2)(v). Adolescents should also be able to comprehend, express, and apply simple and complex ideas, using increasingly complex language in learning and daily living situations. *Id.*

The ALJ recognized that Plaintiff had bilateral hearing loss with related speech deficits, but found that he had "been able to progress in academics with the assistance of an IEP plan, as well as basic classroom accommodations such as preferential seating (Exhibits 6E, 14E, 16E, 5F, and Testimony)." Tr. at 15. She determined Plaintiff had "less than marked limitation in acquiring and using information." Tr. a 17. She stated her conclusion was supported by the state agency consultants' opinions, the school records, and Plaintiff's teacher's statements. *Id.* She indicated Plaintiff's testimony did not show that he needed an amplification device and that he did not take full advantage of the classroom accommodations available to him because he was afraid he would be teased. *Id.*

The undersigned recommends the court find that substantial evidence supported the ALJ's determination that Plaintiff had less than a marked limitation in acquiring and using information. The ALJ recognized that the record demonstrated some limitations as a result of Plaintiff's hearing loss and speech and language deficits based on his school records and the opinions of the state agency consultants and his teacher. *See* Tr. at 69 (Dr. King recognized that school records referenced a speech and language impairment), 187

(Ms. Webster indicated Plaintiff had slight problems with regard to comprehending oral instructions; understanding school and content vocabulary; reading and comprehending written material; comprehending and doing math problems; understanding and participating in class discussions; providing organized oral explanations and adequate descriptions; expressing ideas in written form; learning new material; recalling and applying previously learned material; and applying problem-solving skills in class discussions), 297 (September 8, 2009 testing showed mild conductive hearing loss in the right ear with borderline normal hearing in the left ear; Plaintiff's hearing fluctuates and is better when he is free of middle ear infection; Plaintiff did not use sound field amplification in the classroom; recommended accommodations included preferential seating away from noise sources, sound field amplification in the classroom, as needed), 300 (March 19, 2009 testing indicated moderate conductive hearing loss bilaterally that resulted in difficulty discriminating oral instruction in the classroom setting). However, she concluded that the limitations on Plaintiff's abilities to acquire and use information that resulted from his impairments were less than marked based on the same evidence. *See* Tr. at 69 (Dr. King noted that Plaintiff was not in speech therapy), 187 (Ms. Webster assessed Plaintiff to have "a slight problem" in all activities related to the domain of acquiring and using information), 297 (most recent hearing tests showed only mild conductive hearing loss in the right ear and borderline normal hearing in the left ear). The ALJ's explanation reflects her consideration of Plaintiff's abilities and limitations and the interactive effects of his hearing problems and speech and language deficits. *See* 20 C.F.R. §§ 416.924a(b)(4), 416.926a(a). Because the record showed Plaintiff to have mild

hearing loss, minimal classroom accommodations, and only slight problems with regard to his communicative abilities, the ALJ reasonably determined that he had less than marked limitations in acquiring and using information. *See* 20 C.F.R. § 416.924a(a), (b), 416.926a(a), (e).

### e.    General Consideration of Domains

Although Plaintiff argues the ALJ did not consider the overlap between domains in determining whether his impairments functionally equaled a Listing [ECF No. 13 at 5–6], the undersigned finds the ALJ adequately considered Plaintiff's impairments under the domains in accordance with SSR 09-1p. The ALJ's decision reflects consideration of the "whole child" and his everyday functions in all settings. *See* SSR 09-1p. She considered the activities Plaintiff was able and unable to perform; his difficulties and limitations in performing activities; his level of independence; and the assistance and support he received. *Id.* She explained that she did not find Plaintiff to have more significant limitations as a result of his hearing loss and speech limitations because he had been able to progress in academics with an IEP plan that included basic accommodations such as preferential seating. Tr. at 15. She indicated she considered Plaintiff's eye injury and corneal transplant, but found that it imposed no more significant limitation because his vision stabilized by August 2012 and he reported only blurriness, had 20/200 vision in his right eye, and wore corrective lenses. *Id.* She noted that the record contained no additional evidence regarding Plaintiff's severe impairments and that he had received no treatment in 2013. *Id.* She found that Plaintiff could progress in learning and communicate effectively despite his hearing and speech difficulties. *Id.* She

determined Plaintiff had recovered significantly from his eye injury. *Id.* She pointed out that the record contained no evidence to support a diagnosis of ADHD. *Id.* She noted that Dr. Williams indicated Plaintiff was doing well following septal defect repair and needed no medications or significant follow up. *Id.* She considered that Dr. Zarate opined that Plaintiff's obesity resulted from external factors and was not consistent with any syndrome. *Id.*

After considering Plaintiff's abilities, limitations, and accommodations, the ALJ considered his functioning in each of the relevant domains, and assessed some impaired functioning across several domains. *See* SSR 09-1. She considered the effects of Plaintiff's history of septal heart defect repair, his eye injury and cornea transplant, and his obesity in assessing his limitations in the domain of health and physical well-being and considered his speech and hearing impairments in assessing his limitations in the domains of interacting and relating with others and acquiring and using information. *See* Tr. at 16–17, 18–19, 21.

The ALJ found Plaintiff to have no limitation in attending and completing tasks and less that marked limitation in health and physical well-being, interacting and relating with others, and acquiring and using information based on the record, which showed Plaintiff to require minimal accommodations. *See* Tr. at 15 (explaining that Plaintiff's eye impairment was treated with corrective lenses; that he required no heart medication or significant follow up; and that he was able to progress in learning and communicate effectively), 17 (noting that Plaintiff's hearing problem did not require that he use an amplification device); *see also* SSR 09-1p ("The more help or support of any kind that a

child receives beyond what would be expected for children the same age without impairments, the less independent the child is in functioning, and the more severe we will find the limitation to be."). Because the ALJ considered the relevant evidence and reached a rational conclusion that was sustained by the record, the undersigned recommends the court find that substantial evidence supported her decision that Plaintiff lacked marked or extreme limitation in the domains and, thus, did not have an impairment or combination of impairments that were functionally equal in severity to the Listings.

### 2.    Listing 112.05(D)

Plaintiff briefly argues that the medical and educational records support a finding that his impairments met Listing 112.05(D). Listing 112.05 addresses intellectual disability.  To meet the Listing, Plaintiff must have "significantly subaverage intellectual functioning" and "deficits in adaptive functioning." 20 C.F.R. Part 404, Subpt. P, App. 1, §112.05. In addition, Plaintiff's impairments must satisfy the requirements in either part A, B, C, D, E, or F of the Listing. *Id.* Relevant to Plaintiff's argument, part D of Listing 112.05 requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."  20 C.F.R. Part 404, Subpt. P, App. 1, §112.05(D). The undersigned notes that the record does not contain Plaintiff's IQ scores. *See generally* Tr. at 220–236, 302–322. However, as discussed above, the record does not support a diagnosis of intellectual disability. *See* Tr. at 186–93, 220–236, 302–322, 392. Therefore, the undersigned dispenses with further consideration of Plaintiff's argument.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

April 29, 2016                                    Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).